### In re BREINER.

#### (District Court, N. D. Iowa. April 22, 1904.)

1. BANKRUPTCY—CONCEALMENT OF ASSETS—DISCHARGE.

   Where, at the time of filing a voluntary petition in bankruptcy, the bankrupt knew that he had an interest in his grandfather's estate, and knowingly omitted to list the same in his schedules, for the purpose of concealing it from his creditors, and knowingly made a false oath to such schedules in expectation of receiving a discharge from his debts and afterwards enjoying the property, he was not entitled to discharge.

2. SAME—AMENDMENT OF SCHEDULES.

   Where a bankrupt knowingly omitted certain assets from his schedules, the fact that he listed the property and amended his schedules after his attempt to conceal such assets, and after the fact that he had made a false oath had been discovered, was insufficient to relieve him of the consequences of such acts and entitle him to a discharge.

On Petition of the Bankrupt for Discharge, and Objections of Creditors Thereto.

Kelly & Kelly, for bankrupt.

E. A. Morling and Geo. B. McCarty, for opposing creditors.

REED, District Judge. On November 27, 1903, Dallas D. Breiner, of Emmetsburg, Palo Alto county, was adjudged a bankrupt upon his own petition, which was filed November 25th, but sworn to by him

¶ 1. See Bankruptcy, vol. 6, Cent. Dig. §§ 733, 735.

November 13, 1903. On December 28th following he filed his petition for discharge, and certain of his creditors, within the time allowed therefor, have filed specifications of grounds in opposition thereto, which are substantially (1) that the bankrupt has concealed, while a bankrupt, from his trustee, property belonging to his estate in bankruptcy; and (2) that he has made a false oath to his schedules attached to his petition. From the evidence adduced in support of these specifications it appears that Joseph Breiner, the father of the bankrupt, died December 26, 1902; that Francis J. Breiner, father of Joseph Breiner, and grandfather of the bankrupt, died testate in McDonough county, Ill., August 18, 1903. On March 9, 1900, the grandfather made his will, whereby he devised 80 acres of land and bequeathed certain personal property to one of his daughters, and the remainder of his estate, real and personal, in equal shares to six other children (of whom Joseph Breiner, the bankrupt's father, was one) and the children of a deceased son; thus leaving to the father of the bankrupt one-seventh of the remainder of his estate. After the death of the bankrupt's father, and on January 13, 1903, the grandfather made a codicil to his will, the material parts of which are as follows:

"1st. It is my will that my former will, executed March 9th, 1900, shall stand in all particulars except as hereinafter mentioned. Since my above will was executed, my son Joseph Breiner departed this life. It is my will, and I hereby bequeath said Joseph Breiner's share to the children of said Joseph Breiner, after the death of their mother Hester Breiner. During the natural life of said Hester Breiner my executors are directed to pay to said Hester Breiner, the income derived from said share, and my executors are directed to keep said share invested in some secure manner for that purpose. 2nd. After the death of said Hester Breiner, my executors are directed to pay to said children of said Joseph Breiner, their said shares in equal parts share and share alike."

On August 25, 1903, the executors named in the will of the grandfather filed the same in the probate court of McDonough county, Ill., together with a petition praying that probate thereof be granted. This petition recites that the deceased (the grandfather of the bankrupt) died seised of real estate valued at about $18,000, and possessed of certain personal property estimated to be worth about $20,000, and names the heirs of the deceased, with their places of residence; and among them is that of the bankrupt, Dallas D. Breiner, his place of residence being given as Emmetsburg, Iowa. About August 26th the clerk of the probate court of McDonough county, Ill., mailed to the bankrupt at Emmetsburg, Iowa, a certified copy of this petition, which recites that October 5, 1903, has been fixed as the time for the hearing proof of said petition. The bankrupt admits that he received this copy through the mails, at Emmetsburg, about September 1, 1903; and it appears that the will and codicil were duly proven and admitted to probate October 31, 1903, at a term of court which began October 5, 1903.

In Schedule B–4, attached to the bankrupt's petition (which we have seen was signed and sworn to by him November 13, 1903), under the head of "Rights & Powers, Legacies and Bequests," he answers, "None." The bankrupt testified on January 19, 1904, that he is one of nine children or heirs of the said Joseph Breiner, and entitled to

one-ninth of his estate; that his mother, Hester Breiner, was still living, and probably 67 or 68 years old; that he does not know her exact age. He was questioned closely in regard to the above-mentioned statement in his schedule, and testified that it was true so far as he knew. In answer to questions as to his knowledge of his grandfather's will, he says:

"I supposed he left a will. Don't know positive that he did. Supposed that, with the amount he had, probably he did. Q. Haven't you been informed by letter from McDonough county, Illinois, that he did leave a will? A. I had a letter from Illinois. I thought it was a letter. I don't know what you would call it. I guess it was a petition. Q. What information did this paper give you? A. Well, I couldn't tell you. There was a good deal on that paper. I couldn't give you a statement of what was on that paper. * * * I haven't received a copy of my grandfather's will. I sent for it, and waited quite a while, but didn't get it. Sent to my uncle, and he said he didn't know what a copy would cost. That is the last I heard of it. * * * Q. Did you not, through him or some other source, learn that you had an interest in your grandfather's estate? A. I don't know as I did. All I know about it would be that my grandfather died, and left what he had. I supposed it would be left to the family. Q. Haven't you said to parties in this county that you had an interest in that estate, but it was subject to your mother's life estate? A. I expect I have said that probably. I said that, if my mother was to die, I supposed, if there was anything left, I would get my share of it. Q. Didn't the paper sent you from Illinois inform you that you had an interest in your grandfather's estate? A. Well, I don't know for sure that it did or didn't. I told you before I don't know what was on that paper; that is, I don't know now. I think I read the paper I received from Illinois. * * * Q. This paper did inform you of the amount of your grandfather's estate? A. Yes, sir; I think it said what it was. I don't recollect what it was. Q. After you received that paper, didn't you know that you had an interest in your grandfather's estate? A. I have forgot how the paper read, but I don't see how I could know neither, because I didn't know, from the way that paper read, if I understood the paper. I don't say that I understood that paper. I don't understand the way it reads myself."

Further questions in regard to this paper were not freely nor frankly answered by the bankrupt, and when requested to produce the paper he declined to do so, or at least did not do so (claiming that he had left it at home, some six miles distant from where he was being examined) until he was ordered by the referee to produce it. In pursuance of such order, he later produced a duly certified copy of the petition of the executors for the probate of the grandfather's will. It gives the estimated value of the estate as hereinbefore stated, is in writing and print, and gives the bankrupt's name and address in typewriting as one of the heirs of the testator. The envelope in which it came to the bankrupt shows that it was received at Emmetsburg August 28, 1903, and he says that he got it within two or three days thereafter. The bankrupt was then shown a copy of the will and codicil of his grandfather, and asked:

"Are you now willing to amend your schedule in the bankruptcy proceedings, and add the legacy herein bequeathed to you, and list it as one of your assets? A. Surely, if I have a right to. I don't know anything about that paper myself, and don't know if I have a right to do such a thing."

After conferring with his counsel, he was again asked:

"After having consulted with your attorneys, I will now ask if you will proceed to amend your schedule, and file the legacy and expectancy described in

the codicil read to you as one of your assets in the bankruptcy proceedings? A. Yes, sir, I do. Listed it before if I had known it. Wrote for it, but didn't get it. That is what I wrote for, with that intention."

Cross-examined by his attorneys, he says:

"Q. State whether or not you endeavored to procure and secure any information concerning your grandfather's estate? A. Why, only just by sending for the will, or sending for a copy of it. I didn't receive the copy. Q. You may state why you sent for the will. A. I sent for it with the intention of this bankruptcy proceeding. Q. What did you intend to do in the bankruptcy proceeding with reference to that will, or your interest, if any you had? A. I intended to list it. Q. And how long did you wait from the time you received this notice until you commenced bankruptcy proceedings? A. The 27th of November, I believe, was the day the papers were acknowledged. Q. That is, from about the 1st of September until the 27th of November? A. Yes, sir. Q. Did you get any information, directly or indirectly, that you had any interest in the estate of your grandfather? A. Not anything more than what was on that petition. * * * Q. At the time you signed the petition for bankruptcy and all schedules thereto attached, did you have any intention or desire to secrete or hide or in any other manner cover up any property in which you had an interest? A. No, sir."

Afterwards, and on January 29, 1904, an amendment to the schedule was filed with the clerk as follows:

Amendment to Schedule B–4.

| | |
|---|---|
| Rights & Powers Legacies and Bequests. | One of the eight or nine legatees who are to inherit their father's share of their grandfather's estate, now held and to be held for life by petitioner's mother, supposed valuation ..................... $500.00. |

This amendment was not verified, and no leave was asked or granted to file the same. No explanation is made or offered of the failure of the bankrupt to list this interest in his grandfather's estate in his original schedules, unless it be his equivocal statements that he did not know, when he made such schedules, that he had such interest.

It satisfactorily appears from this testimony that at the time the bankrupt made and filed his petition he had an interest, as legatee under his grandfather's will, in the latter's estate. That he knew at such time that he had such interest cannot, under his own testimony, be doubted. When his attention was first called to its omission from Schedule B–4, he says "that his schedule is true, so far as he knows." The copy of the petition for the probate of the will which he produced names him as one of the heirs, and he admits having received this copy about September 1st (six weeks before he signed and swore to the petition). Afterwards, in answer to questions by his attorney, he says that he sent for a copy of the will in order to list whatever interest he might have thereunder in this bankruptcy proceeding. This is inconsistent with the former part of his testimony, in which he endeavors to maintain that he did not know that he had an interest under that will. The value of this interest does not appear, except from the recital in the petition for the probate of the will. It is a fair inference, however, from the testimony of the bankrupt, that his grandfather's estate was of considerable value; and in the amendment to his schedules which he has filed he says the supposed value of his interest in that estate is about $500. The bankruptcy law is designed to afford relief to the unfortunate debtor; but to receive the benefits

of that law in a full discharge from his liabilities he must lay before his creditors all of his property except such as may be exempt to him under the laws of the state in which he lives, and make true oath that he has done so. If he knowingly fails to do this, a discharge from such debts will be denied him. The conclusion from the whole testimony is unavoidable that this bankrupt did know that he had an interest in his grandfather's estate at the time he made and filed his petition in bankruptcy; that he knowingly omitted listing such interest in his schedules of his property for the purpose of concealing it from his creditors; and that he knowingly made a false oath to such schedules in expectation of receiving a discharge from his debts, and afterwards enjoying the benefits of this property freed from liability for such debts. The fact that he listed the property after his attempt to conceal the same and after the making of the false oath by him had been discovered will not relieve him from the consequences of such acts; neither will his denial, then made, of any intent on his part to secrete, hide, or otherwise cover up such property. The right to a discharge is forfeited if the bankrupt knowingly conceals his property, or knowingly makes a false oath in the bankruptcy proceedings; and it is not restored when his wrongful acts are discovered, or attempts frustrated.

It follows that the petition for discharge must be denied, and it is so ordered.